UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MICHAEL THOMPSON individually and as | ) | |
|     Trustee of the Michael Louis Thompson | ) | |
|     Revocable Trust U/A/D May 1, 2013 | ) | |
|        Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| JK GERTLER HOLDINGS LLC   and | ) | Jury Demanded |
| RA GERTLER HOLDINGS, LLC, | ) | |
|       Defendants | ) | |

## COMPLAINT

This action is brought by Michael Thompson, both individually ("Thompson") and as Trustee (the "Trustee," and collectively, the "Plaintiff") of the Michael Louis Thompson Revocable Trust U/A/D May 1, 2013 against defendants JK Gertler Holdings LLC ("JK Holdings" and RA Gertler Holdings, LLC ("RA Holdings" and collectively the "Defendants") based on their conduct as members of Scrap Metal Services, LLC ("SMS"), an Illinois limited liability company.

## PARTIES

1.     Michael Thompson, as Trustee of the Michael Louis Thompson Revocable Trust U/A/D May 1, 2013 (the "Trust") is a member of SMS. Thompson is neither an employee nor involved in management or operations of SMS. Individually, Thompson is a creditor of SMS, and SMS owes him in excess of $3.5 million. Plaintiff is domiciled in Indiana, and resides in Saint John, Indiana.

2.     JK Gertler Holdings LLC is a member of SMS. It is an Illinois limited liability corporation with its principal place of business in Flossmoor, Illinois. On information and belief, its only member is Jeffry Gertler, who is domiciled in Illinois and resides in Flossmoor, Illinois.

3.    RA Gertler Holdings, LLC is a member of SMS. It is an Illinois limited liability corporation with its principal place of business in Chicago, Illinois. On information and belief, its only member is Richard Gertler, who is domiciled in Illinois and resides in Chicago, Illinois.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a), based on the diversity of citizenship of the parties with Plaintiff a citizen of Indiana and Defendants both citizens of Illinois. The amount in controversy, exclusive of costs and interests, exceeds $75,000.

5.    This Court has personal jurisdiction over Defendants because, *inter alia*, Defendants all reside or do business in this District.

6.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because the actions giving rise to this action occurred in this District.

## FACTS

7.    Thompson, Jeffry Gertler, Richard Gertler, and Jerry Corcoran, Jr. ("Corcoran"), were the original members of SMS.

8.    Thompson transferred his membership interest in SMS to himself as Trustee on behalf of the Trust.

9.    Jeffry Gertler transferred his interest in SMS to defendant JK Holdings. Jeffry Gertler is the manager of JK Holdings. On information and belief, Jeffry Gertler is the only member of JK Holdings.

10.   Richard Gertler transferred his interest in SMS to RA Gertler Holdings, LLC. Richard Gertler is the manager of RA Holdings. On information and belief, Richard Gertler is the only member of RA Holdings.

11.     There is currently a dispute regarding the percentage ownership of SMS by the various

members of SMS.

12.     Jeffry Gertler and Richard Gertler (collectively, the "Managers") are the only managers

of SMS, and they have been the only managers of SMS since 2007.

13.     The Managers' agreement to a course of action is necessary for SMS to act pursuant to its

Managers' decision.

14.     SMS is controlled pursuant to the Second Amended and Restated Operating Agreement

of Scrap Metal Services, LLC (the "Original Operating Agreement"), which Thompson, the

Managers and Corcoran entered into in or about July 2007, a copy of which is attached hereto as

Exhibit 1.

15.     The Original Operating Agreement was amended pursuant to the First Amendment to

Second Amended and Restated Operating Agreement of Scrap Metal Services, LLC (the

"Amendment" and collectively with the Original Operating Agreement, the "Operating

Agreement"), which was implemented on or about April 25, 2011, a copy of which is attached

hereto as Exhibit 2.

16.     On information and belief, there have been no other amendments to the Operating

Agreement. Plaintiff requested SMS's Operating Agreement and all Amendments be provided to

him pursuant to the Illinois LLC Act, but SMS and the Managers failed to provide the requested

SMS documents.

17.     Pursuant to the Operating Agreement, JK Holdings, as the assignee of Jeffry Gertler,

controls who is one of SMS's managers, and, on information and belief, JK Holdings has kept

Jeffry Gertler as its manager selection.

18.     Pursuant to the Operating Agreement, RA Holdings, as the assignee of Richard Gertler, controls who is one of SMS's managers, and, on information and belief, RA Holdings has kept Richard Gertler as its manager selection.

19.     Neither Thompson nor Corcoran have had any input into the Managers remaining the Managers of SMS.

20.     Pursuant to the Operating Agreement, ¶7.4(f), SMS cannot make any distribution to its members if SMS has creditors and SMS "would be unable to pay its debts as they become due in the usual course of business" after making the distribution.

21.     On or about August 8, 2012, SMS issued a note payable (the "$980k Note") to Thompson that was to mature on December 31, 2018. SMS has not satisfied this note, and $980,000 in principal, plus interest, remains outstanding.

22.     On or about September 29, 2014, SMS issued a note payable (the "$1.35M Note") to Thompson that was to mature on December 31, 2018. SMS has not satisfied this note, and $1,350,000 in principal, plus interest, remains outstanding.

23.     On or about May 31, 2017, SMS issued a note payable (the "$217k Note" and collectively with the $980k Note and the $1.3M Note, the "Thompson Notes") to Thompson that was to mature on November 30, 2022. SMS has not satisfied this note, and $217,704 in principal, plus interest, remains outstanding.

24.     Pursuant to the financial condition of SMS, to maintain the existence of its debt to a third-party financial institution, Thompson had to agree to restraints on SMS's payment of the Thompson Notes or SMS would have had the third-party debt called for default. The restraints are in the form of subordination agreements entered as to each of the Thompson Notes.

25.     On information and belief, based on assertions by the Managers, the subordination agreements were extended and applied to two successor third-party lenders, currently Bank Leumi.

26.     Pursuant to the Subordination Agreement (2012 and 2017 Member Subordinated Debt) (the "$980k and $217k Subordination") at §2.3(b), SMS was permitted to pay interest at 8% on the $980k Note and the $217k Note so long as the senior debt was not in default and would not be rendered into default by the payment of the accrued interest.

27.     SMS has failed to pay the interest on the $980k Note or on the $217k Note after the distribution to its members.

28.     On information and belief, during the period SMS has owed Thompson under the $980k Note and the $217k Note, there were times SMS was not in default as to any of the senior debt and would not have gone into default by paying interest on the $980k Loan or on the $217k Loan.

29.     Pursuant to the Subordination Agreement (Existing Member Subordinated Debt) (the $1.35M Subordination") at §2.3, SMS was permitted to pay interest on the $1.35M Note at prime interest rate so long as the senior debt was not in default and would not be rendered into default by the payment of the accrued interest.

30.     SMS has failed to pay the interest on the $1.35M Note after the distribution to its members.

31.     On information and belief, during the period SMS has owed Thompson under the $1.35M Note, there were times SMS was not in default as to any of the senior debt and would not have gone into default by paying interest on the $1.35M Loan.

32.     Pursuant to the Subordination Agreement $980k and $217k Subordination at §2.3(c), SMS was permitted to pay the principal owed under the $980k Note and the $217k Note so long as the "Payment Conditions," certain financial ratios related to SMS's financial condition and debt obligations, were met both before and after the payment of principal on the Thompson Notes.

33.     SMS has failed to pay the principal owed on the $980k Note or on the $217k Note after the distribution to its members.

34.     Plaintiff has no information regarding whether SMS failed to pay the principal owed under the $980k Note and the $217k Note because it did not satisfy the Payment Conditions or that it elected not to pay the principal even though it satisfied the Payment Conditions, which information is in SMS and the Managers' possession.

35.     Pursuant to the $1.35M Subordination at §2.3, SMS was permitted to pay principal of the $1.35M Note quarterly provided that SMS provided audited financial statements to the senior lender, SMS was not in default and would not be rendered into default due to the payment, and certain financial calculations were met.

36.     SMS has failed to pay principal on the $1.35M Note after the distribution to its members.

37.     Plaintiff has no information regarding whether SMS failed to pay the principal owed under the $1.35M Note because it did not satisfy the payment criteria or that it elected not to pay the principal even though it satisfied the payment criteria, which information is in SMS and the Managers' possession.

38.     By not paying the interest and principal owed under the Thompson Notes, SMS failed to pay its creditor in the usual course of business. SMS failed to do so after making the distributions to its members.

39.     By relying on the subordination agreements to preclude paying the amounts owed under

the Thompson Notes, SMS is failing to pay its creditor in the usual course of business.

40.     SMS's financial condition requiring creditors to subordinate the Thompson Notes

demonstrates that SMS is failing to pay its creditors in the usual course of business. The

Thompson Notes are all past their maturity date, and it is only the extraordinary need to

subordinate the Thompson Notes due to SMS's financial condition that necessitated the

subordination agreements upon which SMS relies for its failure to pay the Thompson Notes.

41.     In 2019, the Managers had SMS transfer $1,111,364.96 of SMS's funds to SMS's

members as distributions.

42.     The Managers indirectly paid themselves, through their ownership of JK Holdings and

RA Holdings, in excess of 74% of SMS's funds the Managers distributed in 2019.

43.     In 2022, the Managers transferred $1,766,145.96 of SMS's funds to SMS's members as

distributions.

44.     On information and belief, based on the Managers' assertions that Bank Leumi approved

the member distributions related to the sale of the Foremex Buyers sale, the property being sold

was collateral of the senior debt and implicated the subordination agreements.

45.     The Managers indirectly paid themselves, through their ownership of JK Holdings and

RA Holdings, in excess of 95% of SMS's funds distributed to SMS's members related to the

Foremex Buyers sale.

46.     On information and belief, the Managers have authorized additional distribution to

SMS's members while the Thompson Notes and related interest have remained unpaid.

47.     On information and belief, the Managers have transferred funds directly, and indirectly to themselves and to Defendants through other entities they own and/or control, during the period from 2018 to the present, including transfers for less than fair value received by SMS.

48.     In 2019, the Managers had SMS make a $5,700,000 capital call (the "Capital Call"). The Capital Call related to a settlement between SMS and a minority owner of a business in which SMS had acquired the majority ownership position.

49.     On information and belief, based on communications with the minority owner and review of pleadings, the settlement was necessitated by the Managers' improper conduct against the minority owner.

50.     The Managers asserted that, due to the claims against SMS related to their conduct, SMS was effectively worthless, and they used that assertion coupled with the Capital Call to greatly reduce Plaintiff's ownership interest in SMS.

51.     Since that time, the Managers have had SMS provide several different percentages as Plaintiff's ownership interest in SMS.

52.     On information and belief, Jeffry Gertler ceased being an employee of SMS, and became solely a manager, around the time of that settlement.

53.     On information and belief, Jeffry Gertler's conduct underlying the claim that was settled was one of the reasons for the change in his role as SMS after that settlement.

54.     On information and belief, Richard Gertler ceased being an employee of SMS, and became solely a manager, around the time of that settlement.

55.     On information and belief, Richard Gertler's conduct underlying the claim that was settled was one of the reasons for the change in his role at SMS after that settlement.

**COUNT I – DISSOCIATION OF DEFENDANTS FROM SMS**
**PURSUANT TO 805 ILCS 180/35-45(6)**

**Michael Thompson Individually Against Both Defendants**

56.     Thompson incorporates and realleges paragraphs 1-55 as though fully alleged herein.

57.     Each Defendant is responsible for its manager/agent's conduct as to SMS, including but not limited to the direct and indirect improper benefits the Managers have provided to the Defendants.

58.     The Managers' conduct alleged herein, including but not limited to making distributions to SMS members when SMS's obligations to creditors have not been paid in the usual course of business and the conduct underlying the need to settle the claim requiring the $5.7 million capital call, adversely and materially affected SMS's business.

59.     Defendants know and benefitted from the Managers' willful breach of the Operating Agreement through the conduct alleged herein, including but not limited to making distributions to SMS members when SMS's obligations to creditors have not been paid in the usual course of business.

60.     Defendants willfully breached their fiduciary duties of care and loyalty, as well as the Operating Agreement and the Illinois LLC Act, through permitting and benefitting from the Managers' conduct alleged herein, including but not limited to making distributions to SMS members when SMS's obligations to creditors have not been paid in the usual course of business, the conduct underlying the need to settle the claim requiring the $5.7 million capital call, making improper payments to themselves, directly or indirectly, for less than fair value and without proper notice, and making distributions to themselves in excess of their ownership percentage.

        WHEREFORE, Plaintiff requests an order dissociating JK Gertler Holding LLC and RA Gertler Holding LLC as members of Scrap Metal Services, LLC, and for such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT

### Michael Thompson Individually against Both Defendants

61.    Plaintiff incorporates and realleges paragraphs 1-55 as though fully alleged herein.

62.    On information and belief, Defendants have become parties to the Operating Agreement.

63.    The Operating Agreement precludes SMS making distributions to its members if SMS has creditors and SMS "would be unable to pay its debts as they become due in the usual course of business" after the distribution is made. Operating Agreement, ¶7.4(f).

64.    Defendants breached the Operating Agreement by having the Managers have SMS make distributions while unable to pay its creditors in the usual course of business after the distributions were paid, and then keeping those distributions made to the Defendants.

65.    SMS's creditors are an identified beneficiary of the Operating Agreement's ¶7.4(f) that SMS cannot make a distribution to its members if it cannot pay its creditors.

66.    Thompson is in the group of creditor beneficiaries protected by ¶7.4(f) of SMS's Operating Agreement.

67.    Defendants' conduct caused damages to Plaintiff in the amount of the $2,877,509.96 in improper distributions to SMS's members.

WHEREFORE, Plaintiff requests judgment against Defendants for the $2,877,509.96 in improper distributions of SMS's funds to its members while SMS was not paying its creditors, and for such other and further relief as the Court deems just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY
### Michael Thompson as Trustee against Both Defendants

68.    Plaintiff incorporates and realleges paragraphs 1-55 as though fully alleged herein.

69.    Defendants owed a fiduciary duty to the Trustee as the members of SMS.

70.     Defendants willfully breached their fiduciary duties of care and loyalty to the Trustee, as well as the Operating Agreement, through the conduct alleged herein, including but not limited to making and receiving distributions to SMS members when SMS's obligations to creditors have not been paid in the usual course of business, the conduct underlying the need to settle the claim requiring the $5.7 million capital call, making improper payments to themselves, directly or indirectly, for less than fair value and without proper notice, and making distributions to themselves in excess of their ownership percentage.

71.     Defendants' conduct caused damages in the amount of the improper payments, including but not limited to the $1,111,364 distributed in 2019 and the $1,766,145.96 distributed in 2022.

72.     As to the $5.7 million capital call, Defendants, through their managers, turned their misconduct into an asserted decrease in the Trustee's ownership of SMS. Defendants directly or indirectly provided the funds for the settlement, and then asserted a capital call was necessary to fund the settlement related to Defendants' misconduct.  When Trustee refused to pay funds for Defendants' misconduct, Defendants asserted SMS had no value, in large part due to Defendants' misconduct, and that Trustee's refusal to pay the funds effectively reduced his ownership to almost nothing.

73.     Defendants have exacerbated that by offering numerous different calculations of the amount of SMS owned by Trustee since the $5.7 million capital call.

74.     The Trustee has been damaged by the improper payments to SMS's members, by payments to Defendants and by the allegedly reduction in the membership interest in SMS.

WHEREFORE, Plaintiff requests judgment against Defendants for breach of fiduciary duty for the improper payments of SMS's funds, improper payments to Defendants, reduction in value of

the Trustee's membership in SMS, for punitive damages, and for such other and further relief as

the Court deems just and proper.

April 19, 2023

                                        Respectfully submitted,


                                        By: ___*John Moynihan*_____
                                              One of Plaintiffs' Attorneys


John W. Moynihan
Cooney Corso & Moynihan, LLC
1311 Butterfield Rd Ste 308
Downers Grove IL 60532
847 477 3919
jmoynihan@ccvmlaw.com
***Attorneys for Plaintiff***
Attorney No. 6212061